# Exhibit D

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----

| | | |
|---|---|---|
| PHILIP FEI, on behalf of | : | 07 Civ. 8785 |
| himself and classes of | : | |
| those similarly situated, | : | |
| Plaintiff, | : | |
| -against- | : | |
| WEST LB AG, | : | |
| Defendant | : | Rule 30(b)(6) |

----

Tuesday, March 18, 2008

----

Pretrial examination of LISA CARRO, held in the offices of Outten & Golden, 3 Park Avenue, 29th Floor, New York, New York, commencing at 9:05 a.m., on the above date, before Mickey Dinter, Registered Professional Reporter, Certified Shorthand Reporter and Notary Public for the State of New York.

----

U.S. LEGAL SUPPORT
1 Penn Plaza
Suite 1410
New York, New York 10119
212.759-.6014

----

it relates to prior to my employment, but I wouldn't necessarily say that I have all the information.

Q. Are you qualified to speak to topic number 4 which is, "Defendant's policies and practices regarding recording hours worked by Class Members"?

A. No.

Q. Are you qualified to speak to topic number 5 which is, "Defendant's policies and practices concerning payroll procedures with respect to overtime compensation"?

A. No.

Q. What is your title?

A. Executive Director of Human Resources, Regional Head of the Americas.

Q. Have you been in that position since November 2004?

A. No.

Q. What was your first position when you started?

A. Director of Human Resources.

Q. For how long did you hold that position?

A. From November 2004 through September -- I'm sorry, wait a minute. November 2004 through April 2006.

Q. What happened in April 2006?

A. I was promoted to executive director.

Q. Have you held any other positions at West LB?

A. Yes. In September 2006, I was promoted into overall responsibility for Human Resources.

Q. Any other positions?

A. No.

Q. I believe you said that you worked at the West LB office on the Avenue of the Americas?

A. Yes.

Q. Is that the main headquarters of West LB, New York?

A. In New York, yes, it's the primary location.

Q. What are the other locations in New York?

A. Actually, I don't believe that we have any other space in New York. I

believe we have been consolidated in that building, basically.

Q. Previously, were there other locations in New York?

A. There was an office across the street. I don't know the exact address. There was an office over on the east side, a very small office, a subsidiary.

Q. Do you know when all the offices were consolidated into one?

A. I don't know.

Q. Do you know when --

A. Within the last year; very recent.

Q. Was the consolidation of both of those offices within approximately the last year?

A. Yes.

Q. Are there any other West LB locations in the United States?

A. Yes.

Q. Where are they?

A. There is an office in Houston.

Q. Where else?

A. There are no other offices.

Q. Is there an office in Chicago?

A. Sorry. Yes, there is an office in Chicago. West AM, another subsidiary.

Q. To whom do you currently report?

A. To the global head of Human Resources.

Q. What is that person's name?

A. Carl Hines Grossepeclum. That's G-R-O-S-S-E-P-E-C-L-U-M.

Q. Could you, just briefly, tell me what your duties are?

A. I'm responsible for Human Resources. All of the HR generalists report to me. I'm responsible for the HR function regionally of the HR people in Brazil as well.

Q. Anything else?

A. That's a high-level review.

Q. What are the corporate titles of employees of West LB?

MR. BASSEN: I would object. I don't see how that is in the scope of the notice.

THE WITNESS: The corporate titles -- the corporate titles are executive, manager, associate

director, director, executive director, managing director.

BY MS. NEILAN:

Q. When did West LB first start using the corporate titles?

A. I don't know.

Q. Did West LB use these corporate titles?

A. They were in effect when I joined, yes.

Q. Do you know if these corporate titles were in place in October 2001 until November 2004?

A. I couldn't say for sure.

Q. Do you know if there were any corporate titles at West LB used prior to November 2004?

A. I'm not aware of any.

Q. Do you know who came up with these titles?

A. I have no idea.

Q. What does the title "executive" mean?

A. It doesn't have a meaning. It's just a title.

Q. What is it a title for?

A. It's a title for certain employees who are at a lower level in the organization. By "lower," I mean secretaries, people in the mail room, not necessarily professionals, what we considered to be professionals.

Q. And are executives the lowest level of employees at West LB?

A. It's the first title, the lowest level title.

Q. Is there anyone who has a position that is below a position of executive at West LB?

A. In New York?

Q. Let's start with New York, yes.

A. No, not really.

Q. What about elsewhere in the United States?

A. No.

Q. Anybody lower than the title of executive?

A. Not that I'm aware of.

Q. Do all employees at West LB have corporate titles?

A. All employees in the United States have corporate titles.

Q. So, you mentioned that secretaries and employees in the mail room are classified as executives, is that correct?

A. Yes. There may be others. That's not a full list.

Q. Please give me the full list of all types of employees that are classified as executive.

A. I don't have a full list off the top of my head.

Q. What employees do you know, sitting here now, to be classified as executives and mail employees?

A. There may be some people in the IT department, some people in our Purchasing Department. There may be others, but I don't have a full list off the top of my head.

Q. Are there any documents that list which employees are classified as executives?

A. Documents? There may be documents. There may be reports, yes, that would list

would determine the length of time it would take.

Q. What if you just wanted to request all active executives at West LB in the United States?

A. I don't know. I don't run reports all the time.

Q. Who runs reports out of that system?

A. Our HRIS people. There's two of them. One name is Jean D'Elena; the other is Andreas Stempfle.

Q. Are there any documents that describe what an executive is at West LB?

A. Not that I have ever seen.

Q. Are team assistants considered executives?

A. Team assistants, yes. They are primarily secretaries, but that's a functional title.

Q. What does that mean, "functional title"?

A. Within the HRIS system, there are, what they call, functional titles which are somewhat more descriptive than the

corporate titles.

Q. What is the difference between a corporate title and a functional title other than that the functional title is more descriptive?

A. Just basically that. A corporate title is just a title. Different classes of employees, different types of employees doing different types of work can all have the same title, same corporate title.

The functional title is supposed to be slightly more descriptive in terms of what the person actually does.

Q. So, apart from the secretaries and team assistants, mail room employees, maybe some IT department employees and the purchasing department employees, are you aware of any other executives at West LB in the United States?

A. Not that I can think of off the top of my head, but there may be others that I'm just not, I'm just not remembering.

Q. And what are the functional titles of the mail room employees?

A. I don't know.

Q. What do the executives who work in the mail room do?

A. Mail room employees, they do different things. There are people that actually deliver mail. There are people who are, who play more of a facilities role.

Again, I don't have a list in front of me so I can't really speak to the answer fully.

Q. If you had a list in front of you, could you speak to the answer fully?

A. I could do a better job than what I'm doing right now.

Q. Who are the executives in the IT department?

A. I don't know. I don't have a list of all employees in front of me, so I don't know.

Q. If you had a list of all executives in front of you, would you be able to tell me who are the executives within the IT department?

A. I might be able to tell you. It would be easier for me if I had a list of

Q. What do they mean?

A. A non-exempt employee is an employee who is performing work that is -- well, there are a number of things but, for the most part, that does not require independent judgment necessarily. They are really taking direction from someone else. They are eligible for overtime.

Q. What about exempt?

A. Exempt employees are performing work or responsibilities where they are exercising independent judgment amongst other things and they are not eligible for overtime.

Q. Does West LB currently classify all executives as non-exempt?

A. I believe all of our executives are non-exempt.

Q. Since when has West LB classified all executives as non-exempt?

A. The executives were, all executives were evaluated, job descriptions were evaluated. I believe it was prior to when I got there. They started a project and they reevaluated or finally reevaluated

sometime around, I would say, May, June of 2005.

Q. Since when has West LB classified all executives as nonexempt?

A. I believe since June of 2005.

Q. And how can you verify that?

A. I would have to go back to the payroll system to verify it.

Q. So, is there any other place that you can verify that information?

A. Yes, I would have to go back to records, documents, associated with a reclassification project that was done.

Q. What reclassification project was done?

A. There was a project that started before I got there where a consultant was engaged. The consultant and our internal counsel worked on a project to address changes in legislation as well as to review the classification of our executives.

Q. So, since June 2005 has West LB paid executives... strike that.

Since 2005, has West LB

classified all executives as non-exempt?

A. I believe so.

Q. Does that mean since June 2005, all secretaries, team assistants, have been classified as nonexempt?

A. I believe so, yes.

Q. That means since June 2005, all employees in the mail room have been classified as non-exempt?

A. All employees, no. Not all employees in the mail room, no.

Q. Are there some employees in the mail room who are classified as exempt?

A. Yes.

Q. Who is that?

A. There is a mail room supervisor, I believe, who is exempt.

Q. Do you know that person's name?

A. I don't.

Q. Since June 2005, has West LB classified all executives in the mail room as non-exempt?

A. Yes.

Q. Since June 2005, has West LB classified all executives throughout the

information that you are looking at?

A. I believe there is some sort of indicator inside of payroll, but I couldn't say for sure because we switched payroll systems. So, depending upon the timeframe, I would have to, maybe, use more than one means to determine that.

Q. When you say "indicator," what do you mean?

A. A field. A field in the system.

Q. So, the payroll system has some sort of code or key that indicates whether an employee is exempt or non-exempt?

A. I believe so. I believe there may be something inside of the payroll system to indicate that.

Q. Is that in the current system?

A. For certain in the current payroll system; and I would guess there would have been something, but I couldn't say for sure since, again, I don't manage the payroll system.

Q. When was the payroll system changed?

A. The most recent time was just this

past January and there was one time before that where we switched payroll systems which was prior to my joining West LB.

Q. What is the name of the current payroll system?

A. ADP.

Q. What is the name of the payroll system prior to that January 2008?

A. Ceridian.

Q. What is the name of the payroll system prior to you joining?

A. I don't know.

Q. What happened in June 2005 that West LB started to classify all executives as non-exempt?

MR. BASSEN: Objection. Asked and answered.

THE WITNESS: There was a project that was initiated by consultants and our internal counsel to address changes in legislation and, as part of that, they reviewed the classifications of all of our executives.

BY MS. NEILAN:

Q. What is the name of the consulting company involved in the classification project.

A. Her name was Vivian Yost.

Q. What is the name of the in-house counsel?

A. Gregory Lahey.

Q. Apart from those two individuals, was anyone else from West LB involved in the reclassification project?

A. Yes. A number of people in the resource department.

Q. Who?

A. I was involved at one point. Greg Reiber was involved. There may have been others, but I'm not sure who else might have been.

Q. Was Linda Shirley involved?

A. I don't think so.

Q. What about Amy Favetta?

A. She may have been involved. I don't know for sure.

Q. What about Frank Canuto?

A. I don't think Frank would have been involved in that.

Q. As part of this reclassification project, did West LB determine whether to classify executives as exempt or non-exempt?

A. Their job descriptions were evaluated. The testing was done by the consultants. It was reviewed by counsel and, I believe, that many of them, didn't say all of them, many of them were reclassified as non-exempt.

Q. Was this a change in status prior to June 2005?

A. I'm not sure I understand what that question is.

Q. When you said that many executives were classified as non-exempt after the reclassification project, was that a change in the classification status of the executives prior to June 2005?

A. It was effective in June 2005. They were notified probably in May, May/June 2005.

Q. So, did the classification status as exempt or non-exempt for executives change in 2005?

A. Yes, the classification status changed in 2005.

Q. Prior to June 2005, did West LB classify executives as exempt from overtime?

A. Not all executives, no.

Q. Okay. Prior to 2005, did West LB classify some executives as exempt from overtime?

A. Yes.

Q. And were there any changes in the job duties of executives before this reclassification in June 2005?

A. I don't know. I would not be able to say.

Q. So, you have no knowledge whether the duties of executives from, prior to June 2005, were different from their job duties after June 2005?

MR. BASSEN: Objection as beyond the scope of the notice for the deposition.

THE WITNESS: I'm not aware of whether or not they were.

BY MS. NEILAN:

so in terms of adding new hires to the list and people who it potentially impacted, that was a role that I played.

Q. How did you know which hires to add to the list of the individuals who were hired to be reclassified?

MR. BASSEN: Objection. That's not what she said.

THE WITNESS: Repeat your question.

BY MS. NEILAN:

Q. How did you know which types of new hires to add to the list of individuals?

A. The job descriptions were evaluated. If an individual was hired based on a particular job description or for a particular role, that's how they were identified.

Q. Okay. So, then, these new hires you could decide whether or not they should be classified as exempt or non-exempt based on the job description?

A. Based on their job description.

Q. West LB classifies individuals as except or non-exempt based on job

descriptions?

A. Yes.

Q. And what job descriptions did Vivian Yost and Gregory Lahey examine during your reclassification project?

MR. BASSEN: Objection. Outside the scope of the deposition.

THE WITNESS: I couldn't say. There are a number of -- I couldn't say exactly what they were.

BY MS. NEILAN:

Q. Do you know any of the job descriptions they examined?

A. There were many of them. I assume that they were, you know, secretaries and there were many. I know that there were many job descriptions.

Q. Let's talk with respect to executives. What job descriptions of executives did the reclassification project examine?

A. I can only speak based on my knowledge of who was reclassified and, so, for certain, they would have looked at secretarial job descriptions. They would

have looked at certain job descriptions within the IT department. They probably reviewed the mail room job descriptions and there may have been others. In fact, I know there were others, I just don't know if they all were.

Q. And how could you figure out what they all were?

A. I would have to go back to the documents produced by the consultants and reviewed by the attorney.

Q. What documents were produced by the consultants?

A. The job-testing documents.

Q. So, the job-testing documents include all the job descriptions, is that correct?

A. Yes.

Q. And what other job-testing documents were included?

A. I believe that the tests themselves acknowledged the job descriptions.

Q. With respect to the job descriptions themselves, did the reclassification project issue you job

descriptions or were they just evaluating job descriptions that were in place?

A. The job descriptions, the job descriptions may have been updated and then evaluated. I'm not sure, actually.

Q. When did the reclassification project start?

A. Before I got there. So, it would have been, I believe, sometime in the summer or fall of 2004.

Q. Who updated the job descriptions?

A. To the extent any job descriptions were updated, I believe -- well, you know, I really couldn't say because I'm not sure exactly what the consultant did outside of the testing.

Q. So, what did you mean when you said a few moments ago that the job descriptions may have been updated and then evaluated?

A. It's possible that the job descriptions were updated as a part of that project. So, in other words, in other words, the consultant would have had to collect job descriptions and make sure

that they were job descriptions for all positions, make sure that they were complete before she performs the job testing.

Q. Did anyone update the job descriptions?

A. I don't know.

Q. When you say that the job descriptions may have been updated, you don't really know, you are guessing about that?

A. I said "may have." I said that they may have been updated as a part of the project.

Q. Sitting here right now, you have no knowledge of the job descriptions actually being updated as part of the reclassification project?

MR. BASSEN: Objection.

THE WITNESS: I have no idea.

BY MS. NEILAN:

Q. You do know that as part of the reclassification project, West LB examined the job duties, is that correct?

A. Yes.

Q. And did West LB examine the job duties for all executives at West LB?

A. I believe all executives.

Q. Who creates the job descriptions at West LB?

A. It depends. HR usually works with a manager to determine what a job description looks like.

Q. You also said that there was testing as part of the reclassification project. What do you mean by that?

A. Job testing was applied to all of the job descriptions.

Q. What does that mean?

A. Exemption testing.

Q. So, what did West LB do as part of the exemption testing?

A. The consultants performed the exemption testing in accordance with guidance from the legal department. In other words, the consultants and the lawyer who was assigned to the project worked together on the exemption testing.

Q. What exactly did the consultant and

the lawyer do?

A. I have no idea. I was not involved in that portion of it.

Q. Do you know what factors the consultant and the lawyer considered when they were conducting the exemption testing?

MR. BASSEN: I'm going to -- you are asking about the lawyer.

MS. NEILAN: If she has knowledge of what factor the lawyer and the consultant --

MR. BASSEN: Isn't that privileged and work product?

MS. NEILAN: Are you instructing her not to answer?

MR. BASSEN: First of all, it's beyond the scope of this deposition. If you want to take a deposition about that, then we will consider whether we would waive the privilege.

MS. NEILAN: I'm asking the question right now. It's within the scope of this deposition.

Are you instructing your

client not to answer the question?

MR. BASSEN: It is outside the scope of the deposition and for that reason, because it may be privileged or may be work product, I instruct her not to answer.

As I said, if you want to take, have a different notice for a different deposition on the merits or the substance, then we will consider whether we would waive the privilege.

MS. NEILAN: You understand that in our deposition notice, topics number 2 and 3 are classification and reclassification as class members of exempt and non-exempt?

MR. BASSEN: It asks for the policies and practices for both those things. Policies and practices.

The question you just asked that I instructed her not to answer is neither a policy nor a practice.

As I said, if you want to have a different notice for a different deposition, we will consider

whether to waive the privilege.

MS. NEILAN: This is part of today's deposition. You are instructing her not to answer?

MR. BASSEN: I'm instructing her not to answer for the reasons I have said.

BY MS. NEILAN:

Q. As part of its reclassification project, did West LB examine the duties of each individual... strike that.

As part of the reclassification project, did West LB individually examine the duties of its employees?

MR. BASSEN: Objection. I don't understand the question.

THE WITNESS: Can you repeat the question?

BY MS. NEILAN:

Q. As part of its reclassification project, did West LB examine individually the duty of each of its employees?

A. It was to be examined, the job description of the employee.

Q. So, did it examine each person individually or just based on the job description?

A. West LB would have looked at the job descriptions. I don't know that they would have looked at the individuals. You can't determine by looking at an individual whether or not they are exempt or non-exempt.

MR. BASSEN: I'm taking a break.

MS. NEILAN: I'm in the middle of a line of questions here.

MR. BASSEN: We are taking a break.

MS. NEILAN: This is completely inappropriate.

MR. BASSEN: Good. Note it for the record.

MS. NEILAN: This is completely inappropriate.

MR. BASSEN: Good. I'm taking a break. I need to use the facilities. If that is unacceptable to you -- apparently, that's the way

this firm operates.

MS. NEILAN: Are you finished? Go ahead and use the facility.

(Recess taken.)

----

(Back on the record.)

BY MS. NEILAN:

Q. Is Gregory Lahey in-house attorney at West LB?

A. He was.

Q. When did he leave West LB?

A. I don't remember the exact date.

Q. Other than Gregory Lahey and Vivian Yost, was there anyone else at West LB who was involved in the reclassification project?

A. The reclassification of the executives, I don't think so.

Q. And as part of that reclassification project, did they interview any employees?

A. I don't know for sure. I would guess that they would have, but I don't know for sure.

individuals, what do you mean?

A. Those particular documents they used in order to evaluate the individuals' duties and responsibilities.

Q. What document is that?

A. An exemption testing document.

Q. Where did this document come from?

A. I don't know where they got it from.

Q. Can you describe for me what the exemption testing document looked like?

A. It looks like a form.

Q. What information is on the form?

A. I don't recall.

Q. Was it a checklist? Did they have narrative responses?

A. I don't recall. I know there was typed information on it, but I don't know exactly what was on it.

Q. And do you know if that exemption testing document was created internally at West LB or came from someplace else?

A. I'm pretty sure it came from someplace else.

Q. Do you know where it came from?

A. I do not know.

Q. How do you know that they used this exemption testing document?

A. I have seen it.

Q. How long is it?

A. I think it's more than one page. I'm not exactly sure.

Q. And do you know where you can get a copy of the exemption testing document?

A. At the moment, I don't know where the exemption testing document is, but I probably could get a copy of it if I look for it.

Q. Does West LB still have a copy of it?

A. I'm sure. If not on site, it might be in storage.

Q. And do you know what Vivian Yost and Gregory Lahey did when they actually applied this exemption testing document...

Let me start again. Did they apply the exemption testing document to the job description itself?

A. They used a job description in order to facilitate the testing.

Q. Did they just look at the job

description and then complete the exemption testing form, or is there something else that they did?

A. I don't know. I didn't do it. I wasn't with them when they did it. I don't know.

Q. But you are aware they applied the job description to the exemption testing document?

A. I know that they used job descriptions, yes.

Q. You know that they used an exemption testing document?

A. I do.

Q. Apart from that, are you aware of any other documents that they used to perform the exemption testing?

A. Not that I'm aware.

Q. And do you know what factors were listed for consideration on the exemption testing document?

A. No, I don't.

Q. Did West LB consider the amount of time that the executives spent performing administrative tasks?

MR. BASSEN: Objection. This is neither a policy nor a practice, so it's beyond the scope of the Notice of Deposition.

THE WITNESS: I don't know the details of what they evaluated. I know that they had an exemption testing document. I know that they reviewed job descriptions. That's really all I know.

BY MS. NEILAN:

Q. So, do you know if they evaluated how much time executives spent on matters of significance?

A. I don't know.

MR. BASSEN: Same objection.

BY MS. NEILAN:

Q. Do you know if they evaluated how much time executives spent making discretionary decisions?

MR. BASSEN: Same objection.

THE WITNESS: I don't know.

BY MS. NEILAN:

Q. You have no idea what they evaluated?

Q. Was the role that they were filling listed in their job description?

A. The job description was a complete description of their responsibilities.

Q. Did the H.R. person hiring an individual after June 2005 know how to classify them based upon their job description?

A. Yes.

Q. Did you have any involvement in exemption testing in 2004?

A. No.

Q. Did you ever issue any reports regarding exemption testing?

A. Issuing reports? I believe I updated a document with some numbers.

Q. What kind of numbers?

A. The number of individuals that were evaluated, number of individuals that were deemed exempt, non-exempt, et cetera.

Q. As part of its exemption testing, did West LB find that it had improperly classified executives as exempt?

MR. BASSEN: Objection.

THE WITNESS: I couldn't

say that they determined that individuals were improperly classified. What I can say is that they had determined that certain individuals based on their responsibilities should have been reclassified as non-exempt.

BY MS. NEILAN:

Q. As part of this reclassification project, West LB determined that certain executives were actually, indeed, non-exempt employees?

A. West LB determined that individuals who, up until that point in time, may have been classified as exempt based on their dues and responsibilities or reclassified as non-exempt.

Q. Why did West LB make that determination?

A. Based on the exemption testing.

Q. Did West LB find that in fact some of these executives were not properly classified previously?

MR. BASSEN: Objection. Asked and answered.

THE WITNESS: As I said,

based on the responsibilities that were evaluated during the testing, West LB determined that those individuals should have been classified as non-exempt.

BY MS. NEILAN:

Q. But they were not previously?

A. That they were not previously.

Q. Did West LB seek any opinions from the Federal or State Department of Labor with respect to its reclassification project?

A. I couldn't say. I didn't participate in the exemption testing, so I don't know.

Q. Did West LB seek the advice of outside counsel with respect to its exemption testing?

A. I don't know. I don't know if they did as it relates to executives reclassification.

Q. So when did... strike that.

What company did the consultant work for that West LB hired to conduct the exemption testing?

A. An independent consultant.

Q. Was she affiliated with any corporate entity?

A. I don't think so.

Q. Apart from Miss Yost, did West LB hire any other consultants with respect to the exemption testing or the re-classification project?

A. Vivian Yost.

Q. Apart from Vivian Yost, did West LB hire any other outside consultant with respect to the exemption testing on the reclassification project?

A. Not that I'm aware of.

Q. Approximately, how many executives did West LB determine that it had to reclassify as non-exempt after the reclassification project?

MR. BASSEN: Objection.

THE WITNESS: I don't know the exact number.

BY MS. NEILAN:

Q. Can you give me your best estimate?

A. No, I really can't. I don't have an idea what the number was.

Q. Do you think it was five or fifty or one hundred?

A. I don't think we have had a hundred executives, so it was probably less than one hundred. I couldn't say specifically beyond that.

Q. About how many executives were there at West LB in 2005?

A. I have no idea.

Q. You know it was less than one hundred?

A. We only have five hundred people. I know it was less than a hundred.

Q. West LB currently has five hundred employees?

A. Less than five hundred now.

Q. What about in 2005, approximately how many employees did West LB have?

A. Approximately, five hundred at that point.

Q. And what is your best estimate of the number of executives at West LB currently?

A. Currently? This is a guess. It is only a guess. I would say, maybe, forty.