# Exhibit E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----

PHILIP FEI, on behalf of himself and classes of those similarly situated, Plaintiff, : 07 Civ. 8785

-against- :

WEST LB AG, Defendant : Rule 30(b)(6)

----

Tuesday, March 18, 2008

----

Pretrial examination of LISA CARRO, held in the offices of Outten & Golden, 3 Park Avenue, 29th Floor, New York, New York, commencing at 9:05 a.m., on the above date, before Mickey Dinter, Registered Professional Reporter, Certified Shorthand Reporter and Notary Public for the State of New York.

----

U.S. LEGAL SUPPORT
1 Penn Plaza
Suite 1410
New York, New York 10119
212.759-.6014

----

A P P E A R A N C E S:

OUTTEN & GOLDEN, ESQS.
BY: LINDA NEILAN, ESQUIRE
3 Park Avenue
New York, New York 10016
212.245.1000
Counsel for Plaintiff

HUGHES, HUBBARD & REED, LLP.
BY: NED H. BASSEN, ESQUIRE
One Battery Park Plaza
New York, New York, 10004-1482
212.837.6090
Counsel for Defendant

director, director, executive director, managing director.

BY MS. NEILAN:

Q. When did West LB first start using the corporate titles?

A. I don't know.

Q. Did West LB use these corporate titles?

A. They were in effect when I joined, yes.

Q. Do you know if these corporate titles were in place in October 2001 until November 2004?

A. I couldn't say for sure.

Q. Do you know if there were any corporate titles at West LB used prior to November 2004?

A. I'm not aware of any.

Q. Do you know who came up with these titles?

A. I have no idea.

Q. What does the title "executive" mean?

A. It doesn't have a meaning. It's just a title.

Q. What is it a title for?

A. It's a title for certain employees who are at a lower level in the organization. By "lower," I mean secretaries, people in the mail room, not necessarily professionals, what we considered to be professionals.

Q. And are executives the lowest level of employees at West LB?

A. It's the first title, the lowest level title.

Q. Is there anyone who has a position that is below a position of executive at West LB?

A. In New York?

Q. Let's start with New York, yes.

A. No, not really.

Q. What about elsewhere in the United States?

A. No.

Q. Anybody lower than the title of executive?

A. Not that I'm aware of.

Q. Do all employees at West LB have corporate titles?

A. All employees in the United States have corporate titles.

Q. So, you mentioned that secretaries and employees in the mail room are classified as executives, is that correct?

A. Yes. There may be others. That's not a full list.

Q. Please give me the full list of all types of employees that are classified as executive.

A. I don't have a full list off the top of my head.

Q. What employees do you know, sitting here now, to be classified as executives and mail employees?

A. There may be some people in the IT department, some people in our Purchasing Department. There may be others, but I don't have a full list off the top of my head.

Q. Are there any documents that list which employees are classified as executives?

A. Documents? There may be documents. There may be reports, yes, that would list

information that you are looking at?

A. I believe there is some sort of indicator inside of payroll, but I couldn't say for sure because we switched payroll systems. So, depending upon the timeframe, I would have to, maybe, use more than one means to determine that.

Q. When you say "indicator," what do you mean?

A. A field. A field in the system.

Q. So, the payroll system has some sort of code or key that indicates whether an employee is exempt or non-exempt?

A. I believe so. I believe there may be something inside of the payroll system to indicate that.

Q. Is that in the current system?

A. For certain in the current payroll system; and I would guess there would have been something, but I couldn't say for sure since, again, I don't manage the payroll system.

Q. When was the payroll system changed?

A. The most recent time was just this

past January and there was one time before that where we switched payroll systems which was prior to my joining West LB.

Q. What is the name of the current payroll system?

A. ADP.

Q. What is the name of the payroll system prior to that January 2008?

A. Ceridian.

Q. What is the name of the payroll system prior to you joining?

A. I don't know.

Q. What happened in June 2005 that West LB started to classify all executives as non-exempt?

MR. BASSEN: Objection. Asked and answered.

THE WITNESS: There was a project that was initiated by consultants and our internal counsel to address changes in legislation and, as part of that, they reviewed the classifications of all of our executives.

BY MS. NEILAN:

Q. What is the name of the consulting company involved in the classification project.

A. Her name was Vivian Yost.

Q. What is the name of the in-house counsel?

A. Gregory Lahey.

Q. Apart from those two individuals, was anyone else from West LB involved in the reclassification project?

A. Yes. A number of people in the resource department.

Q. Who?

A. I was involved at one point. Greg Reiber was involved. There may have been others, but I'm not sure who else might have been.

Q. Was Linda Shirley involved?

A. I don't think so.

Q. What about Amy Favetta?

A. She may have been involved. I don't know for sure.

Q. What about Frank Canuto?

A. I don't think Frank would have been involved in that.

Q. I'm just asking for your knowledge.

A. I don't know for sure.

Q. Who would know?

A. They would know.

Q. As part of that reclassification project, did they conduct any surveys?

A. What do you mean by survey?

Q. Do you not know what a survey means?

A. I would like to know what you mean. Why don't you tell me what you want to know.

Q. What is your definition of survey?

MR. BASSEN: Objection.

THE WITNESS: Based on my definition of survey, I'm not aware that --

BY MS. NEILAN:

Q. What is your definition of survey?

A. A document which asks questions of individuals, be it electronic in nature or written in nature.

Q. Do you have any knowledge of what was involved in the exemption testing other than viewing the job descriptions?

A. They applied the exemption test to the job descriptions or the job responsibilities and functions the individuals were responsible for.

Q. And did they apply exemption testing to the job description by just looking at the piece of paper that had the job description?

A. I don't know exactly what they did. I know other than having reviewed the actual job descriptions or duties of the individual, they may have asked questions. They may have had to add information to the job description. I don't know.

Q. You don't know, you have no knowledge of them interviewing any employees regarding their duties, is that correct?

A. I don't know. They may have. I would think that they probably did, but I don't know for sure.

Q. You have no knowledge of that?

A. No. I have no knowledge of it.

Q. When you said that they applied the exemption testing function to the

individuals, what do you mean?

A. Those particular documents they used in order to evaluate the individuals' duties and responsibilities.

Q. What document is that?

A. An exemption testing document.

Q. Where did this document come from?

A. I don't know where they got it from.

Q. Can you describe for me what the exemption testing document looked like?

A. It looks like a form.

Q. What information is on the form?

A. I don't recall.

Q. Was it a checklist? Did they have narrative responses?

A. I don't recall. I know there was typed information on it, but I don't know exactly what was on it.

Q. And do you know if that exemption testing document was created internally at West LB or came from someplace else?

A. I'm pretty sure it came from someplace else.

Q. Do you know where it came from?

A. I do not know.

Q. Was the role that they were filling listed in their job description?

A. The job description was a complete description of their responsibilities.

Q. Did the H.R. person hiring an individual after June 2005 know how to classify them based upon their job description?

A. Yes.

Q. Did you have any involvement in exemption testing in 2004?

A. No.

Q. Did you ever issue any reports regarding exemption testing?

A. Issuing reports? I believe I updated a document with some numbers.

Q. What kind of numbers?

A. The number of individuals that were evaluated, number of individuals that were deemed exempt, non-exempt, et cetera.

Q. As part of its exemption testing, did West LB find that it had improperly classified executives as exempt?

MR. BASSEN: Objection.

THE WITNESS: I couldn't

say that they determined that individuals were improperly classified. What I can say is that they had determined that certain individuals based on their responsibilities should have been reclassified as non-exempt.

BY MS. NEILAN:

Q. As part of this reclassification project, West LB determined that certain executives were actually, indeed, non-exempt employees?

A. West LB determined that individuals who, up until that point in time, may have been classified as exempt based on their dues and responsibilities or reclassified as non-exempt.

Q. Why did West LB make that determination?

A. Based on the exemption testing.

Q. Did West LB find that in fact some of these executives were not properly classified previously?

MR. BASSEN: Objection. Asked and answered.

THE WITNESS: As I said,

based on the responsibilities that were evaluated during the testing, West LB determined that those individuals should have been classified as non-exempt.

BY MS. NEILAN:

Q. But they were not previously?

A. That they were not previously.

Q. Did West LB seek any opinions from the Federal or State Department of Labor with respect to its reclassification project?

A. I couldn't say. I didn't participate in the exemption testing, so I don't know.

Q. Did West LB seek the advice of outside counsel with respect to its exemption testing?

A. I don't know. I don't know if they did as it relates to executives reclassification.

Q. So when did... strike that.

What company did the consultant work for that West LB hired to conduct the exemption testing?

A. An independent consultant.

Q. Was she affiliated with any corporate entity?

A. I don't think so.

Q. Apart from Miss Yost, did West LB hire any other consultants with respect to the exemption testing or the re-classification project?

A. Vivian Yost.

Q. Apart from Vivian Yost, did West LB hire any other outside consultant with respect to the exemption testing on the reclassification project?

A. Not that I'm aware of.

Q. Approximately, how many executives did West LB determine that it had to reclassify as non-exempt after the reclassification project?

MR. BASSEN: Objection.

THE WITNESS: I don't know the exact number.

BY MS. NEILAN:

Q. Can you give me your best estimate?

A. No, I really can't. I don't have an idea what the number was.

Q. And do you think that there were approximately forty executives in 2005 also or were there more or less?

A. There might have been more. There were more people at that time. There might have been slightly more.

Q. So, about out of those approximately forty, maybe four executives in 2005, what percentage did West LB reclassify as non-exempt after the reclassification project?

MR. BASSEN: Objection.

THE WITNESS: I don't recall.

BY MS. NEILAN:

Q. Was it all of them?

MR. BASSEN: Objection.

THE WITNESS: Again, I don't recall the numbers. I don't.

BY MS. NEILAN:

Q. I don't want the exact number. I'm entitled to your best estimate.

MR. BASSEN: You are not. It's beyond the scope of the deposition. It's neither a policy nor

a practice.

THE WITNESS: It's not an estimate. Honestly, it would be a guess. A guess is not going to be anywhere near right.

BY MS. NEILAN:

Q. Give me your best guesstimate.

MR. BASSEN: Objection.

THE WITNESS: Honestly, I don't know. All of them, no. Not all of them were reclassified.

BY MS. NEILAN:

Q. Was it more than one?

A. It was more than one.

Q. Do you know if it was closer to ten or closer to forty?

MR. BASSEN: Continuing objection.

THE WITNESS: I don't know. I honestly don't know.

BY MS. NEILAN:

Q. So, what did West LB do after it reclassified executives as non-exempt after the exemption testing was complete with respect to the compensation of those

individuals?

A. Once they were reclassified as non-exempt, they were eligible for overtime.

Q. When did West LB start paying executives after the reclassification project overtime compensation?

A. Yes. They paid them overtime after they were reclassified and they paid them back pay 'til, I believe it was, August '04.

Q. When did West LB start paying these executives that it reclassified overtime going forwards?

A. I believe it was June of '05.

Q. In June '05, did West LB start paying all executives overtime compensation?

A. All executives who were classified as non-exempt.

Q. So after June '05, have there been some executives at West LB who have been reclassified as exempt?

A. Not that I'm aware of.

Q. What do you mean when you say that West LB paid back pay to August 2004?

A. I mean that they were paid for any

overtime that they did back until 2004. Sorry, August 2004.

Q. Who was responsible, I mean which individuals were responsible for paying reclassified executives back pay?

A. For paying them? Actually, paying them?

Q. Yes.

A. The payroll manager was responsible for paying them.

Q. And how did the payroll manager know how much to pay them?

A. The payroll manager received a spreadsheet with the names of the individuals impacted. He was asked to verify the amounts to insure that the calculations were correct and to process the payments.

Q. Who gave the payroll manager the spreadsheet?

A. I did.

Q. Do you have that spreadsheet?

A. Do I have the spreadsheet? Probably somewhere we have it.

Q. How did you create that spreadsheet?

A. How?

Q. Did you create the spreadsheet?

A. The spreadsheet was, yes. I don't know that I created the original version of the spreadsheet. Yes, I updated the spreadsheet to include the estimated overtime for those who were impacted.

Q. When you say "those who were impacted," those who were reclassified as non-exempt?

A. Yes. Those who were reclassified, yes.

Q. How did you calculate the back pay that was to be paid to the reclassified executives?

A. The executives were consulted along with our managers. The managers did a first estimate. The individual managers did a first estimate of the overtime. And the manager met with their, they met with their staff members once the estimate was done and it was processed.

Q. Did you ever talk to the managers about how to conduct this first estimate?

A. Yes.

Q. What did you tell them?

A. We told them that the individuals were reclassified and that they were eligible for overtime. We asked them to do the first estimate of what they believed their overtime might be based on their own knowledge of the individuals' schedule, projects that they might have worked on, et cetera.

They had a certain period of time in which to conduct the estimate and provide it to Human Resources. Once the calculation was done, the managers were notified of the calculation and were asked to meet with their individual employees to discuss the situation with them and explain it to them and to provide them with the overtime calculation. If anybody had a question about it or dispute or, you know, another calculation, they were welcome to come and speak with someone at HR about that and we were open to revising it.

Q. Did HR every make any revisions that were prepared by the managers?

A. I don't know. I don't remember.

Q. Why did West LB choose to pay the back pay to August 2004?

A. We were advised by counsel to do it.

Q. Who advised you to do that?

A. Certainly, internal counsel; and it may have been in conjunction with discussions that he had externally.

Q. With who internally?

A. Greg Lahey.

Q. Did anyone explain to you why August 2004 was chosen as the date?

MR. BASSEN: Objection. Privileged.

MS. NEILAN: She waived the privilege.

MR. BASSEN: No, she hasn't.

MS. NEILAN: Are you instructing her not to answer?

MR. BASSEN: Yes. Outside the scope of this deposition.

BY MS. NEILAN:

Q. Do you know why August 2004 was chosen as the date?

MR. BASSEN: Objection.

She said it was on the advice of counsel.

BY MS. NEILAN:

Q. Can you answer the question?

MR. BASSEN: I direct her not to answer the question.

MS. NEILAN: Why?

MR. BASSEN: Because it's outside the scope of the deposition and it's privileged, as I told you before.

If you want to take a deposition of this thing, have a notice, we will consider whether to waive the privilege or not, which we very well might do.

MS. NEILAN: With respect to your first objection, that does not prohibit, not allow the defendant not to answer. The witness, excuse me, did not answer the question.

Are you instructing her not to answer because of attorney/client privilege? That's the only grounds that she cannot answer the question.

privileged.

MS. NEILAN: So, it's based on privilege?

MR. BASSEN: In conjunction with an improper question outside the scope. If there was a proper scope, then we would consider waiving the privilege. It's not the time for us to consider it here because that's not what the deposition called for.

MS. NEILAN: If you do not consider it attorney/client privilege, then I will move on.

BY MS. NEILAN:

Q. Did West LB make any retroactive payments to executives for work that they performed prior to August 2004?

A. Not that I'm aware of.

Q. So, with respect to all of the executives that West LB classified in... strike that.

Let me start again. With respect to all of the executives that West LB reclassified as non-exempt in the spring of 2005, is it correct that West LB

did not pay any of those executives overtime compensation for any time period prior to August 2004?

A. Repeat the question.

Q. Sure. With respect to all the executives that West LB reclassified as non-exempt in the spring of 2005, is it correct that West LB did not pay any of those executives overtime compensation for any time period prior to August 2004?

A. Not that I'm aware of.

Q. So is the answer, yes, to the best of your knowledge?

MR. BASSEN: Asked and answered.

THE WITNESS: I'm not aware of any additional overtime pay.

BY MS. NEILAN:

Q. Are you aware of West LB paying any executives that it reclassified as non-exempt in the spring of 2005 overtime compensation for work that they performed prior to August 2004?

MR. BASSEN: Let the record note this is the third time the

question has been asked and answered.

THE WITNESS: I'm not aware of it.

BY MS. NEILAN:

Q. How did you verify the amounts of overtime that the managers came up with when they estimated unpaid overtime?

MR. BASSEN: Objection. Asked and answered.

THE WITNESS: Managers did the initial estimate and they reviewed their estimates with the executives. Executives had the opportunity to agree or disagree and that's, basically, how the estimates were determined.

BY MS. NEILAN:

Q. Did you verify in any way the estimates?

A. I personally did not verify the estimates.

Q. Did anyone, other than the individual executives managers, verify the estimates?

A. No.

Q. And were the managers actually

coming up with mathematical calculations or were they coming up with hours worked or something else?

A. They were coming up with estimates for overtime, hours worked beyond the normal hours based on projects, assignments, workloads, transactions that were being done during that period of time.

Q. What do you mean when you say "beyond the normal hours"?

A. Normal hours are thirty-five hours a week.

Q. So, prior to the reclassification, were executives paid hourly or salary?

A. Prior to the reclassification? The executives were paid, they were salaried.

Q. And did they receive a salary regardless of the hours that they worked during the week?

A. Yes.

Q. And, so, if an executive worked thirty hours a week, did the executive receive a full salary?

A. If they were exempt -- if they were classified as exempt and they were

A. Or in asset management here in the United States.

Q. Just here in the United States.

A. There's not that many. I would say there's, maybe, maybe a dozen.

Q. With respect to the current employees in the HR department that West LB classifies as exempt, does West LB classify them as exempt under the administration exemption or professional exemption?

MR. BASSEN: No objection to the extent it calls for a legal conclusion.

THE WITNESS: I did not do the exemption testing. I wouldn't be able to speak to that.

BY MS. NEILAN:

Q. Do you know what the executive exemption is under the Fair Labor Standards Act?

A. I have general knowledge of it.

Q. What do you know about it?

A. Not enough to speak intelligently about it.

Exemption testing was done by our internal counsel. As it relates to managers, it was done by external counsel.

Q. Do you have any knowledge of the administrative exemption under the Fair Labor Standards Act?

A. I have knowledge that it exists. I don't know very much about it. We relied on external counsel to do the evaluations of those positions.

Q. Did you ever receive any training on the requirement of the Fair Labor Standards Act?

A. Personally?

Q. Yes.

A. No.

Q. Did you ever receive any training on the requirements of New York Labor Law?

A. No.

Q. What exemption testing was performed by counsel with respect to managers?

A. The outside counsel was provided with job descriptions. They conducted interviews with managers with respect to

the job responsibilities and duties of individuals and they determined the classification of those positions that were being evaluated.

Q. Who was the outside counsel?

A. Rich Greenberg.

Q. What law firm?

A. Jackson Lewis.

Q. When did West LB retain Rich Greenberg to conduct this exemption testing?

A. I don't know the exact date that he was retained. I know that he was given or provided with information sometime in the fall of 2006. I believe he was retained prior to that.

Q. And prior to your retaining Mr. Greenberg to conduct this exemption testing, did West LB conduct any other exemption testing with respect to managers?

A. Not that I'm aware of.

Q. With respect to the reclassification project that you testified earlier, was that limited to executives?

A. The reclassification of the executives was, yes, separate than the evaluation of the managers.

Q. And as part of the -- prior to the exemption testing performed by outside counsel from Jackson Lewis, how did West LB classify managers?

A. I believe up until that point, most, if not all managers, were classified as exempt.

Q. Did there come a time when West LB reclassified some managers as non-exempt employees?

A. Yes. There was a time after the evaluation that West LB reclassified some managers as non-exempt.

Q. When was that?

A. The first reclassification for a small group of individuals was done in January'ish of 2007 and the rest were completed, I would say, in May of 2007.

Q. And how many managers were reclassified in 2007?

A. Somewhere around a dozen.

Q. And how many managers were

reclassified in May of 2007?

A. Somewhere around a dozen. Around a dozen, I would say.

Q. And apart from those two reclassifications, approximately twenty-four positions, did West LB ever reclassify any other managers?

A. Since that time, I don't believe so. I don't believe that anyone up until, I don't believe anybody was promoted. I don't believe that anyone else was reclassified since that time because that would have been after promotions, so, no.

Q. With respect to those twenty-four positions that were -- strike that.

With respect to the twenty-four "manager" positions that were reclassified from exempt to non-exempt, did West LB apply the administrative executive or professional exemption?

A. I don't know. That was determined by outside counsel.

Q. You have no knowledge regarding that?

A. I don't know specifically, no.

Q. Who made the decision at West LB to reclassify those twenty-four manager positions?

A. We were guided by the advice given to us by counsel.

Q. Were you involved in the process?

A. I was involved in the process.

Q. Who else was involved in the process?

A. Amy Favetta was involved in the process. Gregory Reiber was involved in the process. A variety of managers who were interviewed were involved in the process. Natalie Henriquez might have been involved to a lesser extent than the rest of us.

Q. Anybody else?

A. Linda, probably, too. Again, to a lesser extent than the rest of us.

Q. Linda Shirley?

A. Yes.

Q. What was your involvement in the process?

A. My involvement in the process was very limited.

Amy was managing the process in conjunction with Greg and they were dealing with the outside, with outside counsel on the project.

Q. What did you do on the project?

A. I met with Amy. I met with Greg to discuss the project, the status of the project, the outcome of the project and at one point, I met with Rich Greenberg with respect to the positions within HR.

Q. As part of the reclassification of some managers, did West LB issue any surveys?

MR. BASSEN: Objection.

THE WITNESS: I don't believe that there were any surveys. There were interviews.

BY MS. NEILAN:

Q. Who conducted the interviews?

A. Rich Greenberg.

Q. Who did he interview?

A. He interviewed a number of managers. I couldn't say exactly who, off the top of my head.

Q. Did he interview all of the

managers at West LB?

A. I don't know if he interviewed all of them.

Q. Do you know any of the managers that he did interview? Do you know their names?

A. I don't know. I couldn't say who exactly who he interviewed.

Q. How do you know he interviewed managers?

A. Because I was advised by Amy and Greg who set up the interviews.

Q. Do you know how many interviews they set up?

A. I don't know how many they set up.

Q. Do you know how long the interviews lasted?

A. The individual interviews them-selves?

Q. Yes.

A. I have no idea.

Q. Did you sit in on any of these interviews?

A. No. Only my own interview. Only when I spoke to him about the HR people.

Q. And when you say that Richard Greenberg interviewed the managers, was he interviewing the managers that were at the subject of the reclassification project or was he interviewing supervisors of those individuals in questions?

A. Interviewing the supervisors of those individuals in question.

Q. So, did Richard -- did outside counsel conduct any interviews as part of its exemption testing of managers, of the actual managers themselves?

A. I don't know. I'm not sure if he did or not.

Q. You just have knowledge of interviewing supervisors of the managers, is that correct?

A. Yes.

Q. You have no knowledge of outside counsel interviewing the managers themselves?

A. No, I do not.

Q. Would Amy Favetta or Greg Reiber know whether managers themselves were interviewed as part of the exemption

testing of managers?

A. Yes.

Q. So, you never discussed that with Greg Reiber and Amy Favetta?

A. It never came up in conversation.

Q. What did come up in your conversations regarding exemption testing managers?

A. Basically, just status updates, where were we with the project?

Q. Do you know what factors outside counsel was evaluating when he interviewed the supervisors or the managers as part of the exemption testing?

MR. BASSEN: I ask you not to answer the question.

MS. NEILAN: Why are you asking her not to answer?

MR. BASSEN: Two reasons: Same as before. Outside the scope of the notice and it's privileged and work product.

If you want to have a proper deposition about it with a proper notice, we will consider

classifications changed?

A. I don't know.

Q. Were any of the managers in the HR department reclassified in either of these reclassifications in 2007?

A. No.

Q. So prior to 2007, all managers in HR have been classified as exempt, is that correct?

A. That's correct.

Q. And since 2007, up to the present time, all managers, with the exception of Sandra Russo, have been classified as exempt, is that correct?

A. That's correct.

Q. As part of the reclassification in January 2007, did West LB pay any of those managers any money?

A. No.

Q. What about the reclassification in May 2007?

A. Once they became, once they were reclassified as non-exempt, they were then eligible for overtime.

Q. So that approximately twelve

managers that West LB reclassified in January 2007 classified them from exempt employees to non-exempt employees, is that correct?

A. Yes.

Q. Why did West LB reclassify them as non-exempt?

A. They were reclassified based on the advice of counsel.

Q. What was counsel's decision based on?

MR. BASSEN: Objection. I direct her not to answer.

MS. NEILAN: Why are you directing her not to answer?

MR. BASSEN: You asked what was counsel's advice based on. That's privileged work product, outside this deposition.

If you want to take a deposition on that properly noticed, we will consider whether to waive it. We are not waiving it now if it's outside the scope.

BY MS. NEILAN:

Q. Why did West LB reclassify the approximately twelve managers that it reclassified in May 2007 from exempt to non-exempt?

A. They were reclassified based on the advice of counsel.

Q. What was the advice of counsel?

MR. BASSEN: Same direction.

BY MS. NEILAN:

Q. Did West LB make any retroactive payments to any of the managers that it reclassified in 2007?

A. No, not that I'm aware of.

Q. Why did West LB make retroactive payments to executives in 2005 that had been classified as exempt and reclassified as non-exempt and not making retroactive payments to managers who were classified as exempt and then classified as non-exempt?

A. Based on the advice of counsel.

Q. What was that advice?

MR. BASSEN: Same direction.

MS. NEILAN: Are you directing her not to answer based on

the attorney/client privilege?

MR. BASSEN: Exactly what I said before.

MS. NEILAN: Based on attorney/client privilege?

MR. BASSEN: Exactly what I said before.

MS. NEILAN: I would like to take a lunch break now.

(Luncheon recess taken, 11:46 a.m.)

----

(Afternoon session commenced, 12:38 p.m.)

BY MS. NEILAN:

Q. So, West LB classified all managers as exempt between 2001 until 2007, is that correct?

MR. BASSEN: Objection.

THE WITNESS: I can tell you from the point that I joined forward. I can't really speak to the period before that.

BY MS. NEILAN:

Q. Do you have any knowledge regarding

instructed you not to answer.

We have already discussed the one conversation that you had with outside counsel regarding West LB's exemption testing and reclassification of the managers. Apart from that, there's no other conversations, is that correct?

A. I had no other conversations with the attorney directly.

Q. Are there written communications between you and outside counsel regarding the same subject matter?

A. Me and outside counsel? No.

Q. Are there any other documents that you're claiming privilege on and, therefore, refusing to answer this question with respect to the subject matter of my question?

A. Could you be a little clearer with that question?

Q. Are there documents that list the factors that West LB's attorney considered when conducting the exemption testing and reclassification of managers?

A. There are the job descriptions

which were central to the project. And outside of that, I do not know what the attorney used with respect to conducting the reclassification.

Q. What about with respect to the exemption testing?

A. I don't know what he used.

Q. I asked you earlier why West LB only made retroactive payments to executives going back to August 2004, do you remember?

A. Yes.

Q. You did not testify based on the advice of counsel based on the attorney/client privilege. Is that based on a conversation that you had with your attorney?

A. That's based on the advice given to us from outside counsel.

Q. Okay. And when did this take place?

A. It would have taken place sometime at the conclusion of the project.

Q. So, approximately, when was that?

A. Probably, January/February

timeframe.

Q. And was it a conversation or was it a written communication between you and outside counsel?

A. There was no written communication from me to anyone. I believe that the information was -- the advice was given to us verbally.

Q. And to whom was it given?

A. I believe that Greg Rieber and possibly even Amy Favetta was involved in those conversations.

Q. Was there anyone else present during those conversations?

A. I don't know.

Q. Is there anything that would help refresh your recollection?

A. No.

Q. Where did those conversations take place?

A. I would assume they would have taken place at the office.

MS. NEILAN: I have no further questions at this moment, again, because West LB has not