# Exhibit G

Case 1:07-cv-08785-HB-FM   Document 52-8   Filed 05/30/2008   Page 1 of 14

```
------------------------------------------------------------

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------x
PHILIP FEI,

          Plaintiff
                              DOCKET NO.: CV-07-8785 (HB)
          -vs-                New York, New York
                              May 22, 2008 WEST LB A.G.,


          Defendant
-------------------------------x

TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE

BEFORE THE HONORABLE FRANK MAAS
UNITED STATES MAGISTRATE JUDGE


A P P E A R A N C E S:

For the Plaintiff:      LINDA A. NEILAN, ESQ.
                          Outten & Golden LLP
                          3 Park Avenue, 29th Floor
                          New York, NY   10016


For the Defendant:      JASON HABINSKY, ESQ.
                          Hughes Hubbard & Reed LLP
                          One Battery Park Plaza
                          New York, NY   10004




Audio Operator:            No Audio Operator

Proceedings Recorded by Electronic Sound Recording Transcript Produced
by Transcription Service
------------------------------------------------------------
KRISTIN M. RUSIN
217 Pine Meadows Circle
Hickory NC 28601
kmrusin@earthlink.net
```

        THE CLERK:  This is a conference in the matter of Fei versus WestLB.

        Counsel, state your name for the record, please.

        MS. NEILAN:  Linda Neilan for plaintiff Fei and the putative class.  Good morning, Your Honor.

        THE COURT:  Good morning.

        MR. HABINSKY:  Jason Habinsky, from Hughes Hubbard & Reed, for WestLB, defendant.

        THE COURT:  Good morning.

        MR. HABINSKY:  Good morning.

        THE COURT:  We don't suffer for a lack of letters in this case, but I guess the first is Hughes Hubbard's letter seeking a protective order regarding the deposition of Messieurs Greenberg and Leahy, both of whom were attorneys who at some juncture advised WestLB with respect to the reclassification of its employees.

        Generally speaking, my reaction to requests not to depose people because they may have privileged information is well, let's take the deposition and see.  But here, it does strike me that except to the extent that there's an argument that the privilege has been waived, it may well be a colossal waste of time, and that, at a minimum, the other witnesses who potentially have information about the reclassification project ought to be deposed first.

        I guess some of those depositions are currently scheduled but haven't yet been taken, is that correct, Ms. Neilan?

        MS. NEILAN:  That is correct, actually.  We did notice some depositions this morning that will involve some of those same individuals that you're referring to.

        THE COURT:  Well, if they're able to answer adequately -- I understand that there was nobody in-house, apparently, at West who could provide information.  But if the outside consultants are able to describe the entire process, why do I have to direct that the attorneys be deposed, except for -- to the extent that the good faith issue enters into this?

        MS. NEILAN:  Okay.  Well, with respect -- setting aside that issue, with respect to the group of managers or executives and managers in this case, there was no outside consultant that WestLB hired to conduct any exemption testing of managers.  They hired outside counsel, Richard Greenberg, from Jackson Lewis to conduct this exemption testing.

        And he was the person who interviewed some of the supervisors of the managers in question.  I don't know if he interviewed the managers himself.  I asked in a deposition of the -- of Lisa Karo [phonetic], who was the head of H.R., who was the company's 30(b)(6) deposition witness, whether he also interviewed the managers themselves, and she didn't know.

        I mean, I asked her many questions about what he did as part of the exemption testing, and she didn't know, and she is the head of H.R.  This was a pretty massive undertaking that they took.  I would presume that she would have knowledge about this, but she did not know.

        And when I asked her if anybody else at WestLB conducted any study into the duties of managers or made observations regarding managers' job duties, she said 'no' or 'I didn't know' to that.  So I think he really is an indispensable fact witness, because he conducted the investigation.  He found out what the duties were of these individuals.

        I don't know what else he did.  I tried to find out in other ways and I couldn't find out, so I want to -- we want to be able to ask

him those questions in a deposition regarding the who, what, when, where, and why -- or maybe not the why yet, but the -- all the -- you know, those W reporter questions about what he actually did.

And setting aside whether the legal advice he ultimately gave the company -- we do think that's waived. But even just setting that aside, I think certainly his underlying investigation -- there's nothing privileged about that, and it is central to this case.

THE COURT: Mr. Habinsky?

MR. HABINSKY: Thank you, Your Honor. With respect to the evaluation of the managers and the reclassification of the managers, Ms. Karo also testified that there were four or five employees from WestLB in the human resources department who also participated in the project. And in fact, plaintiff has sent us the notices for depositions of three of those folks this morning, and so it's our position that they will be able to provide adequate information regarding the project.

Also, Your Honor, defendant has provided extensive document discovery regarding the evaluation and reclassification of the managers, including the very job descriptions. Among the documents produced by defendant is a notebook from one of the human resources employees, Amy Favetta [phonetic], which is basically the work notebook regarding this whole project, which includes job descriptions. It includes notes. It includes lists.

THE COURT: Is she one of the people who's now been noticed?

MR. HABINSKY: She has. So it's our position that there's already been extensive discovery on this very issue, and there's going to be continued discovery on this issue, including the three depositions which were noticed today, and there's two additional employees who haven't been noticed yet who also could provide information regarding this project.

And as far as the executives, which we haven't spoken to, just last week plaintiff deposed Vivian Yost [phonetic], who was the consultant who conducted the project regarding the executives, and she testified in detail about the project, and she also was asked if she had --

THE COURT: Executives are different than managers?

MR. HABINSKY: That's correct. They're two different groups. With respect to the executives, the consultant, Vivian Yost, was asked what, if any, conversations she had with the in-house attorney, Greg Leahy, and she testified that she had one conversation with him only about the project, and that was just a preliminary conversation about whether or not she was qualified to do the job.

THE COURT: How about with Mr. Greenberg?

MR. HABINSKY: She participated in the executive project, not the manager project, so the two of them did not work together.

THE COURT: Okay.

MR. HABINSKY: And also, with respect to the first issue, waiver of the attorney-client privilege by asserting the good faith defense, we're -- I mean, we're willing to stipulate --

THE COURT: Well, go on.

MR. HABINSKY: We're willing to stipulate that we're not going to rely upon advice of counsel as a defense.

THE COURT: But the problem -- well, let me first say that I'm going to reserve decision on the depositions of the attorneys pending the outcome of the depositions of the other witnesses.

But having said that, with respect to the good faith defense, it's fine that you're willing to so stipulate as you indicated, but

let's suppose for argument's sake Mr. Greenberg told your client at an early date this is crazy, you can't classify people that way, and they continued along their merry way.

That would pretty much, if it were disclosed, undermine the good faith defense, and you would be using the attorney-client privilege as a shield. Your stipulation addresses, to my mind, using it as a sword but not using it as a shield. You're saying we won't use it to say counsel told us that this was proper, but there's the possibility that counsel at an early stage told West that what it was doing was improper and it, for some reason, chose to ignore that advice.

If I hold that all of the discussions are privileged, if there was such a conversation, it would never be unearthed.

MR. HABINSKY: But it's my position that through discovery plaintiff will -- already knows what was done, when it was done, who was reclassified, what those job duties were.

THE COURT: Well, suppose -- and you know, I'm not real familiar with the dates. The suit was filed in oh-seven. Let me assume that the reclassification project was in oh-six. But in oh-three, Mr. Greenberg said to somebody running WestLB in New York what you're doing is outrageous, you can't continue this way, and that important person at WestLB said well, it's too expensive to do it the other way, we're going to continue along our merry way.

MR. HABINSKY: But those facts alone would be known, because it's known when WestLB did certain things and when they reclassified. So as far as the timing goes, those facts would be disclosed in discovery.

THE COURT: I'm not following you. If West says that's very nice advice, Mr. Greenberg, we're not going to follow it, and then several years later they decide to reclassify because employees are complaining more vociferously, how does the fact that they were told, in my example, in 2003 what you're doing is wrong become unearthed?

MR. HABINSKY: I understand your point, Your Honor.

THE COURT: I mean, it seems to me there are differences between a good faith defense, for example, in the patent area where usually the defense is we consulted with our attorney, and he or she told us that this patent didn't infringe, or the patent that the plaintiff had is not valid for some reason, and you have the option of saying, in those cases, we're not going to rely on the good faith defense, and therefore what our counsel advised us simply isn't relevant.

Here, because of the problem I just posed, I'm not certain that you can simply say that because as part of our good faith defense we're not relying on counsel's advice as a sword, it follows that there's been no waiver. Candidly, I don't know what the right answer in this area is, notwithstanding the example I've given.

So I think in this area what I'm inclined to do is let one side or the other file a motion, and I'm not sure whether it's more appropriately a motion to compel or a motion for a protective order. I guess you had written originally about this, is that right, or --

MR. HABINSKY: That's right, Your Honor.

THE COURT: -- no, I guess it was -- I guess it was Outten & Golden that wrote first, or --

MR. HABINSKY: Defendants sent --

THE COURT: -- no, you wrote first.

MR. HABINSKY: -- the first letter, Your Honor.

        THE COURT:  So I guess it would be your motion for a protective order, and -- yeah, or cross motions.
        MS. NEILAN:  Yeah.  Yeah, I mean, we'd be happy to do that, or cross motions, and we do think --
        THE COURT:  Okay.  So why don't we do it on cross motions?  How long does each side want to submit its motion papers?
        MR. HABINSKY:  Your Honor, just -- may I seek clarification?  You initially had said that you would withhold judgment until the depositions are going to be taken.
        THE COURT:  Yeah, but they're two separate issues.  I said but for the good faith argument, if -- if I decide in your favor on the good faith argument, it may still be that if I find that Mr. Greenberg, for example, really functioned in an administrative rather than a legal capacity in that he went out and did whatever sort of survey was required, it may be that, in whole or in part, I allow him to be deposed.
        That, it seems to me, is somewhat separate from the good faith question I've just addressed, although there's also overlap.  So let me get back to how long do you want.
        MS. NEILAN:  I'm just thinking, because we have a deadline of early July to file our class certification motion, and we do think that since we -- we think that Mr. Greenberg and Mr. Leahy are important fact witnesses, and we will need to get evidence from them to support our motion, so --
        THE COURT:  Keep your voice up, because --
        MS. NEILAN:  Oh.
        THE COURT:  Otherwise, what you say won't be recorded.
        MS. NEILAN:  Sure.  Sure.  We could file a motion at the end of next week.
        THE COURT:  Okay.  So --
        MS. NEILAN:  Or do you want -- are both parties -- or do you want to --
        THE COURT:  Well, the cross motions I would then --
        MS. NEILAN:  Okay.
        THE COURT:  -- say would be filed May 30th.
        MS. NEILAN:  Okay.
        THE COURT:  A week for opposition papers, is that sufficient?
        MR. HABINSKY:  Your Honor, if I may, I'm going to be on vacation the following week, and I would hope the Court would be willing to consider that.
        THE COURT:  When did you say the class certification motion is due?
        MS. NEILAN:  I believe it's due July 1st or 2nd.
        MR. HABINSKY:  And I'm going to be out of town from May 30th through June 10th.
        THE COURT:  Well, unfortunately, that's too long, and since it basically is a legal issue, and since Hughes Hubbard ain't the smallest firm in town, they will have to find somebody else to work on it.
        I'm going to say June 12th for opposition papers, and because I do want to get a decision in a timely fashion, I think, unless somebody feels strongly otherwise, what I'm going to say is that there will be no reply papers.
        MS. NEILAN:  I think that's fine, especially --
        MR. HABINSKY:  That's fine, Your Honor.
        MS. NEILAN:  -- since it's cross motions.

>THE COURT: So June 12th will be the date for the opposition papers, and then I will try to get a decision out as quickly as possible.
>
>MS. NEILAN: And this is just specifically on the waiver issue, is that correct, or --
>
>THE COURT: On the -- whether the good faith defense waives the privilege.
>
>Assuming that I find that it doesn't, there's still the issue of whether this is a deposition that's necessary and whether there's anything useful that could be obtained, or whether it would just be a series of directions not to answer based on privilege which I later would end up sustaining.
>
>MS. NEILAN: Well, if I may, Your Honor, I do --
>
>THE COURT: Yeah.
>
>MS. NEILAN: -- think -- I do understand that there are other people who are in the H.R. department who were involved in this exemption project and this classification project. Obviously, when we depose them, we'll find out more about their involvement.
>
>But I mean, just from deposing Vivian Yost last week, it seems that when she was finished with the work that she did on the project, she turned it over to in-house counsel, Gregory Leahy, who took it from there and made the decisions about who to classify, or who to keep which secretary to continue as an exempt executive at the firm. And so there's just limited information, certainly, that she had.
>
>And certainly, my hunch is -- I don't know yet because we haven't taken the deposition -- is that these other H.R. people -- they don't have specific information about the actual job duties, which is really at the -- the center point of this litigation -- is whether or not these so-called managers and so-called executives really should have been classified as exempt during the time periods that they were.
>
>Lisa Karo didn't know anything about that. She told me I had to ask Richard Greenberg. He was the one who conducted the exemption testing.
>
>I mean, there's also just a question, too, about efficiency here, because he's the -- he's sort of like a repository. He conducted the exemption tests, and he has all this information about the job duties of all of these different managers.
>
>I mean, we could depose every single supervisor of every manager in question at WestLB. That would certainly be very time-consuming.
>That would be fifty, seventy-five depositions. Maybe we can do each in an hour. Maybe it's a possibility, but -- or we could just depose this one person.
>
>THE COURT: No, I'm not suggesting that you do that.
>
>But let me be clear on this, Mr. Habinsky. With respect to the managers, who other than Mr. Greenberg made the decisions or is competent to testify about the decisions that were made?
>
>MR. HABINSKY: Lisa Karo testified that there were at least four employees who participated in the project and the decisions, and they were Amy Favetta, Greg Reeber [phonetic], Natalie Henriquez [phonetic], and Linda Shirley.
>
>MS. NEILAN: When Ms. Karo was asked in her deposition why did WestLB classify just a select group of managers, or about twenty-four different titles, she said it was based on the advice of counsel. It was Mr. Greenberg who did all this exemption testing.
>
>There may have been lower-level H.R. people involved in the process, but it was my understanding from her deposition it was the

hired investigating attorney who made the decision regarding which individuals to classify.

   MR. HABINSKY:  It's our position that the attorney didn't make any decisions.

   THE COURT:  You're looking at some portion of the deposition transcript, I take it.

   MS. NEILAN:  Right, I'm at --
"Q Why did WestLB reclassify them --"
-- referring to the managers that it reclassified in January of 2007 --
"Q -- as non-exempt?"
"A They were reclassified based on the advice of counsel."

   THE COURT:  Well, but that's -- that's the why question that may be privileged as opposed to the who, what, where, and when questions.

   MS. NEILAN:  But also, when I asked Ms. Karo during her deposition if anyone else at WestLB conducted any study regarding the duties of job manager, she said no.  When I asked her if anyone else made observations about the job duties of manager, she said no.

   It appeared to me clear from her deposition -- and I cited this in my -- in our letter to the Court -- that he was the principal person involved who looked at the job duties, looked at the job descriptions, talked to the supervisors, interviewed some of them.

   She didn't know if he interviewed any of the actual managers in question or not.  I mean, I asked her if he reached out to the Department of Labor to get an advisory opinion from them.  She said she didn't know, I'd have to ask Mr. Greenberg.  And she is the H.R. person.  She is the head of H.R. North America for WestLB.  And if she doesn't know the answers to these questions, I think we have to --

   THE COURT:  Why, for purposes of either class certification or the merits, does it matter why they did it, so long as they did it?  Your theory is that folks were misclassified.  Their reclassification is, in effect, is it not, an admission that you're right?

   MS. NEILAN:  Well, I think the why goes to the question about the -- whether they have a good faith affirmative defense or not, and whether or not we can --

   THE COURT:  Okay.

   MS. NEILAN:  -- prove willfulness.

   THE COURT:  Okay.  And it may be that once that issue is briefed, I may end up agreeing with you.  But, but for the good faith issue, I'm not sure that they can't hide behind the attorney-client privilege even if the prime mover here was Mr. Greenberg.

   MS. NEILAN:  Right.  Well, I think that -- I agree with you on the why question, but just in terms of the facts, I think he has the facts.  He knows what the job duties are, since he was the one who was involved.  He was the one conducting this exemption testing.  So we need that information in terms for our class certification brief to figure out what the -- what the facts were of these -- I'm sorry, what the job duties were, rather, of these managers.

   THE COURT:  Well, but -- and I guess I'm beginning to understand better what it is you're saying is the more laborious way to do it.  It may be that you have to do it the more laborious way, because unless I find that the assertion of the good faith defense waives the privilege, it seems to me it may well be that communications are privileged since they were given for purposes of him rendering legal advice.

If any client goes in to see a firm and relates facts, the facts are not protected, but those facts can be gotten from other witnesses.

But the mere fact that counsel may have more of the facts about more of the people readily accessible doesn't mean that automatically they're deposed.

In any criminal investigation of a corporation, typically outside counsel for the corporation knows far more about what occurred than anybody inside the corporation, because they're in a position to interview everybody, whereas discrete managers often don't have as much information readily at hand, yet the answer is never well, let's just depose counsel because that's the quicker way to get at it.

MS. NEILAN: I think the other issue here, though, is that this is a class action, and this is a practice that the company undertook when it was reclassifying some employees.

And just exploring the whole reclassification project and this exemption testing which Mr. Greenberg is the person who conducted also may provide grounds to support our motion for class certification, if we can show that the practice that they -- that he applied to the company affected all these class members, and we can show how they did it, it certainly supports our motion --

THE COURT: Is there any reason to believe that it was done differently for executives than managers in --

MS. NEILAN: I believe so.

THE COURT: -- terms of a process?

MS. NEILAN: I mean, for executives, for starters, they hired this outside consultant. She came in. She collected job descriptions. They created job descriptions. She wrote a report, and she turned it over to in-house counsel and washed her hands of it. There was no --

THE COURT: Well, I'm still going to adhere to my ruling, although, as I said, you may at some point get that deposition at least for some areas. And I recognize both of you -- and to a certain extent, me as well -- are up against Judge Baer's deadline that he didn't want changed. Okay.

Let me go on to a different issue. I guess there's the privilege log.

MS. NEILAN: That's correct, Your Honor. We brought that issue to Your Honor's attention.

THE COURT: Right. I understand that part of what West has said is well, the plaintiffs used generic descriptions like e-mails also, but if I just start with the very first document on the privilege log, D three forty-eight, document type, document -- I don't know whether that's a letter, a memo, an e-mail, or anything.

Curious, it has no from or to, and the subject matter, not surprisingly, is the Fair Labor Standards Act. But it seems to me that that is not -- well, first of all, since it suggests that you don't know who authored the document, how do I sustain your claim of work product or attorney-client privilege with respect to that document?

MR. HABINSKY: Your Honor, I'm happy to review that particular document and, if it's not specific enough, revise that.

THE COURT: Well, you know, I just picked that as an example.

MR. HABINSKY: Right.

THE COURT: And the subject matter I don't even understand. Description of attorney work product redacted. I don't know what --

MS. NEILAN: Your Honor, I have that document, actually, if you'd like to see it, because it is our contention that this privilege log is just rife with insufficient information in terms --

        THE COURT:  Wait, I'm missing something.  If it's on their privilege log --

        MS. NEILAN:  There's actually -- it's just a word that's redacted.

        THE COURT:  Oh.

        MS. NEILAN:  So they gave us the document.  They redacted one word.

        THE COURT:  Oh, okay.  So -- oh, I see, one -- the phraseology just wasn't conveying meaning to me.  Why don't you hand that one up?  That's probably, then, a poor example, but as long as we're on it.  [Pause]  Well, assuming that -- well, the mere fact that an attorney did something, it seems to me, probably is not privileged and you'd be well advised to reconsider that redaction.

        If it says something like review, or communicate, or whatever it says, it is so generic that it's hard for me to believe that if I looked at the unredacted version I would sustain the privilege.

        But let me go beyond documents which were redacted.

   (Pause in proceeding)

        MS. NEILAN:  If it's helpful, Your Honor, I can point you to certain entries that we think --

        THE COURT:  Please.

        MS. NEILAN:  So in terms of the just insufficient information, starting on page twenty-three of the privilege log, with the fourth entry on there, there's simply very little information about what these documents actually are.  For most of them, they don't say who created them.  They don't say to whom they were distributed.  They don't say when they were created.

        We don't know if they were created a month ago in anticipation of litigation or if they were created -- like, indeed, many of these documents -- years ago before there was any anticipation of litigation.  There's no information here for us to even begin to challenge whether these documents actually could even be privileged.  We don't even know if an attorney created them.

        THE COURT:  Well, more importantly, the burden is on West to show a basis for its assertions of privilege.  If I just look at the first document that is on page twenty-three that's described as a document, how do I know that that's either attorney-client privilege or attorney work product if there's no author indicated?

        More importantly, how do you know it's privileged, Mr. Habinsky, if there's no indication of who authored it?

        MR. HABINSKY:  I apologize, Your Honor.  I'd have to look at the actual document in order to answer that.  But if Your Honor would allow us, we'll review this very carefully and produce a revised privilege log that provides more sufficient information.

        THE COURT:  Bear with me a second.  [Pause]  Yeah, I think you should be mindful of Local Civil Rule 26.2(a)(2)(A), which lists the types of information that ought to be in a privilege log, and says the documents -- the type of document -- e.g., letter or memorandum -- the general subject matter of the document, the date of the document, such other information as is sufficient to identify the document for subpoena duces tecum, including, where appropriate, the author of the document, the addressees and other recipients, and, where not apparent, the relationship of the author, addressees, and recipients.

        At a minimum, if there's no from and to, there's got to be some indication of who the author is.  And even if there's no precise date, it seems to me where you can discern it there ought to be something like the year.  If you have a document that looks and smells like a

privileged document but you don't know where it came from, you don't know who wrote it, and you don't know when it was prepared, you're going to have a hard time convincing me that you can show it's privileged.

       MR. HABINSKY: I understand, Your Honor. I will go back to the office now and make sure that we update it with more specific information.

       MS. NEILAN: If I -- just a few other things, if I may point out, Your Honor.

       THE COURT: Yeah.

       MS. NEILAN: Also, the relationships -- when they do identify some people, we don't know who these individuals are. Obviously, we're beginning to learn who some of them are -- Lisa Karo, H.R. people, et cetera. But there is a whole list of names that we don't know who these individuals are and their relationship to the individuals to whom they've sent any of this correspondence.

       THE COURT: Give me an example.

       MS. NEILAN: For example, Eugene Chan, Michael Birdhouse, Michael Frank, Steven Kluke [phonetic], Kurt Lambert, Thomas McCaffrey, Robert Rubino [phonetic].

       THE COURT: Okay. Well, that's the type of thing, it seems to me, the two of you ought to confer about.

       MS. NEILAN: And we have, Your Honor. We did try meeting -- we did meet and confer with defense counsel on this, and they refused to update their log, and that's why we had to bring it to Your Honor's attention.

       THE COURT: Okay. Well, I'm requiring them to update the log, and I don't want to see either side go through needless motion practice.

       It seems to me, Mr. Habinsky, you ought to be describing generally who these folks are.

       MR. HABINSKY: No problem, Your Honor.

       MS. NEILAN: And in terms of the redactions, Your Honor, I don't know if you want to -- we did bring a sample of the documents that do have the redactions. I do believe they are sufficiently -- or they are
-- they have some identifying information in the privilege log. But like the example we gave to Your Honor before, there's just a word redacted.

       We just -- we can't see how they can at all sustain a work product privilege by blacking out two words next to an attorney's name in what I'm guessing is probably just a document that the H.R. department passed around.

       THE COURT: Well, I mean, let me give you, as an example, one of my rules of thumb. If the question asked of an attorney or a client at a deposition is when did the two of you meet, it seems to me that's not privileged. What did you talk about also isn't privileged, so long as a generic answer is given, like my case, or whether there was a good faith defense.

       When you get to detail that goes beyond that, that's what's privileged. The general subject matter of a discussion is not privileged. The one line I looked at looks like it is akin to the general subject matter. And if there are a lot of mindless little redactions like that that really don't reveal the substance of a conversation, then it seems to me you need to revisit those redactions.

       It's difficult to draw lines in this area because if the topic of the conversation was the homicide that the client committed that

hasn't surfaced anywhere in discovery, merely saying that the general topic was a homicide would reveal details that probably ought not to be revealed.

But in this case, there's no mystery about the fact that Mr. Greenberg and others were engaged in exploring this whole area, so I don't know that the one word here or there, or one sentence here or there, is going to give away the store.

So with that in mind, I think you need to go back and review the redactions and the privilege log.

MR. HABINSKY: We understand, Your Honor. We'd be happy to do so.

THE COURT: And I will give you -- I understand you're going away, but I'll give you till next Friday, a week from tomorrow, to get a revised privilege log and any unredacted documents to counsel.

MS. NEILAN: And the revision of the privilege log -- does that also include their descriptions of the subject matter? Because we also think many of their descriptions of subject matter are just really vague and are not -- for us to be able to challenge whether there really was an attorney-client communication or there really was a work product privilege in the underlying document.

THE COURT: They did strike me as -- I mean, candidly -- and I hope I'm not maligning somebody at your firm -- but it looked to me like something a paralegal assembled, in large part, just because it was so generic. Or maybe it was that an attorney sat down and made it generic in an effort not to disclose anything but --

MR. HABINSKY: I promise, Your Honor, it wasn't me.

THE COURT: Okay. And I'm looking at one line at random, which is Janine Christiano [phonetic] to Fred Maus [phonetic] and Lisa Karo, subject titled meeting. And the subject matter is advice of counsel. If it's we have to have a meeting because, as I advised you, what currently is being done is improper, that's one thing.

If it's hey, are you free on Thursday for a meeting regarding reclassification, that, to my mind, is not privileged. And if the subject matter is so generically described that I can't determine that the document is privileged, you may have problems. So I would suggest that Hughes Hubbard needs to spend some more time coming up with more focused descriptions.

MR. HABINSKY: Happy to do that, Your Honor.

THE COURT: I think that deals with the issues in your May 8th letter, Ms. Neilan.

MS. NEILAN: That's correct. Those are all our issues.

THE COURT: And I think I've dealt with, to the extent I can today, the issues in Mr. Bassen's May 6th letter.

There was also recent correspondence where Ms. Neilan said you raised an additional issue regarding a document request where she wants to meet with you.

MS. NEILAN: And we have spoken, Your Honor, right before today's court conference. We spoke, and we're going to continue to speak, about that issue and see if we can resolve it.

THE COURT: Okay, good.

MR. HABINSKY: Your Honor, if I may, one more issue I'd like to discuss.

THE COURT: Well, let me just stick with this one for the moment.

MR. HABINSKY: Sure, Your Honor.

THE COURT: Okay. Go on, I'm sorry.

       MR. HABINSKY:  Back to the subject of privilege logs and we have --

       THE COURT:  Yes.

       MR. HABINSKY:  -- we also have issues with plaintiff's privilege log that we received, first of all, for similar reasons. Second of all, --

       THE COURT:  Well, one of the things Mr. Bassen said or you said -- I'm not sure who was the author of the letter -- was that plaintiff's descriptions are generic also, but e-mail or memo is more descriptive than document.  It may be that in places Ms. Neilan needs to give you more specificity also.

       Everything I just said about your privilege log also applies to yours, Ms. Neilan, so I'll give you as well a week, --

       MS. NEILAN:  Understood, Your Honor.

       THE COURT:  -- a week from tomorrow, to get a revised log to your adversary.

       MR. HABINSKY:  One example is in the most recent privilege log we received from plaintiff's counsel, it lists e-mails and letters between plaintiff's counsel and potential class members, and although we're not addressing the issue of whether or not those documents are privileged or not -- that's something that we're discussing on our own -- but the entries are -- the dates are April 2008 to present, and it just -- the to line is potential class members.

       That doesn't give us any indication of when the communications occurred and to whom they were made.  Instead, it just groups -- groups them together as potential class members.

       THE COURT:  I'm looking at the exhibits to your May 14th letter, and I see June 2007 to the present.  I don't see anything about April.
Maybe I'm -- oh.

       MR. HABINSKY:  There is a more recent privilege log which --

       MS. NEILAN:  I think the May 20th letter is probably what --

       THE COURT:  Okay.  Let me --

       MS. NEILAN:  -- Jason wants to refer you to.

       THE COURT:  Let me get to that.  [Pause]  Yeah, the problem is I still -- I only have that one in the faxed version.  Do you have a spare copy?

       MR. HABINSKY:  You could have my copy, Your Honor.

       THE COURT:  Okay, April 2008 to the present.  Well, it -- and I wasn't focusing on the date when you mentioned it, but this is well after the lawsuit was filed.  This really, it seems to me, goes to that Alaska decision, Dobbs versus Lamonts Apparel, which when I first read it, Ms. Neilan, struck me as wrong, because how could discussions with potential clients or fact investigation not be work product.

       But then it struck me that perhaps the decision is right to the extent that -- and I'm not sure whether that's what's listed here, but if, for example, a generic questionnaire went out to a class, and they responded, if they're not yet clients, attorney-client privilege doesn't seem to apply, and if the recipients of the questionnaire are doing all the work, I'm not sure it's work product either.

       MS. NEILAN:  And, Your Honor, that's why I wanted to meet and confer with Mr. Habinsky before I brought it to your attention, because that document does not exist in this litigation.  There is no blanket questionnaire that was sent out to class members.  There is no blanket solicitation form or anything like that.

       THE COURT:  Okay.  And conversely, if there's -- starting with Anthony Aardvark and working your way through to whoever's at the end

of the list, there are a series of interviews and a reduction of that interview to writing, even if they're not yet clients, it seems to me that may well be work product.

But I don't know what precisely these e-mails are, you know, but I guess the answer is discuss it and then, if need be, bring it back to me.

MS. NEILAN:  We will, Your Honor.

MR. HABINSKY:  But it's our position, at a minimum, on their privilege log, assuming they're considering these communications to be privileged, that they're identified specifically instead of just grouped together like that.

MS. NEILAN:  And our position, Your Honor, is that if we are going to be itemizing every correspondence we have with --

THE COURT:  Yeah.  I mean, the problem is that they're claiming, among other things, attorney-client privilege.  If you don't stop the clock when the lawsuit was filed, then each of you is going to be -- when you go and report to your client what happened here today, if you do that in writing, you're then going to have to add it to your privilege log and submit an amended privilege log to Ms. Neilan.

It seems to me this falls in the same category.  This suit was filed in 2007.  I don't know that it's useful to individually itemize communications in 2008.

MR. HABINSKY:  I understand, Your Honor.  We'll have a discussion about the details of the communications.

THE COURT:  Okay.  Let me hand this back.

Anything else from you?

MS. NEILAN:  I have nothing further, Your Honor.

THE COURT:  Mr. Habinsky, anything from you?

MR. HABINSKY:  Nothing, Your Honor.

THE COURT:  Well, I guess what I will do, then, is wait to hear from you folks.  If there are issues to be brought back to me, we'll schedule a further conference as quickly as we can.  And once we get those motions, I'll try and address those as quickly as I can.

MS. NEILAN:  Thank you for all your attention to the matter.

MR. HABINSKY:  Thank you, Your Honor.

THE COURT:  Okay.  Have a good day.

\*   \*   \*   \*   \*